# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>v.<br><br>Jose Carlos Durazo,<br><br>                    Defendant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CR13-0714-TUC-RCC(JR)

**REPORT AND RECOMMENDATION**

On April 24, 2013, an indictment was filed charging Defendant Jose Carlos Durazo ("Defendant") with one count of harboring an illegal alien. (Doc. 1). Defendant filed a Motion to Suppress Statements on July 1, 2013, arguing that agents violated his right to counsel and right to remain silent and obtained a confession from him that was not voluntary. (Doc. 12). The government filed a response on July 11, 2013, arguing that because Defendant was not in custody, agents were not required to read him his rights and that even if required, agents complied. (Doc. 16). The government further argues that Defendant's answers to police questions were the result of a voluntary act. (*Id*.).

The matter was heard by Magistrate Judge Rateau on August 19, 2013 (Doc. 17), and on August 26, 2013 (Doc. 20).[1] Defendant was present at both hearings and represented by counsel. The government presented two witnesses at the first hearing and the Defendant testified in his defense. (Doc. 24). Nine exhibits were admitted at the hearing. (*Id*.). At the second hearing, the defense called one additional witness, the government called two

---

[1]Two hearings were scheduled in order to allow the parties to present additional witnesses and not burden the District Court with an additional hearing after a Report and Recommendation was filed by this Court.

witnesses and recalled one witness; no additional exhibits were presented at the second hearing.  (Doc 25).  Having considered the matter, the Magistrate Judge submits the following Findings of Fact and Conclusions of Law and recommends that Defendant's Motion to Suppress Statements be granted in part and denied in part.[2]

I.    **FINDINGS OF FACT**

    **A.    Special Agent Ingegno**

    Agent Ingegno testified that he was the case agent responsible for the search warrant executed on Defendant's home in Douglas, Arizona on April 2, 2013. (TR1 5).[3]  The warrant authorized agents to arrest Jasiel Moreno Cuevas who was possibly an undocumented alien living in Defendant's home.  (TR1 6).  The warrant also allowed for the search of evidence related to Mr. Cuevas' living arrangements in the home.  (Doc. 16).

    There were 30 law enforcement officers involved in the search of Defendant's home. (TR1 6).  The officers were divided into three groups-an entry team, a perimeter group and a search team. (*Id*.).  Among the law enforcement officers present were department officers from the Douglas Police, Cochise County Sheriff, U.S. Border Patrol, Internal Revenue Service, and Homeland Security Investigations ("HSI"). (TR1 19-22 ).  All officers were in uniform or had some sort of clothing with police markings; all officers had guns. (TR1 20, 22).  There were three marked police units and approximately five or six unmarked police units on site. (TR1 20, 27).  Police cars were parked in front of the house, in the back around the alleyway and on the side of the home.  (TR1 27).  Some of the police cars had their overhead lights activated.  (TR1 28, 29).  After entry, ten officers left the scene.  (TR1 69).

    When asked to describe how the search was conducted, Agent Ingegno explained that at 7:00 a.m., the entry team, consisting of 12 to 13 officers, proceeded toward the driveway of the home when a 13 year-old boy came out. (TR1 6, 7, 24).  Agents called him away from

---

[2]Trial is currently scheduled for October 22, 2013 and a plea deadline has been set for October 4, 2013. (Doc. 14).

[3]TR1 refers to the transcript of the August 19, 2013 hearing.

the house and kept him outside. (TR1 7). The entry team then to the front door, knocked and announced that they were law enforcement officers with a search warrant. (*Id*.). They did this both in English and in Spanish. (*Id*.). After the door was not answered for some time, agents "breached the doorway." (*Id*.). Agent Ingegno described the breaching tool as a couple foot long metal cylinder with two handles on it that's banged against the front door to knock it down to gain entry. (TR1 25, 26).

After breaching the door, thirteen agents entered the house with guns drawn. (TR1 26). Officers encountered six people in the house, five of whom were immediately handcuffed and removed from the house. (TR1 7, 32). One of the five was Jasiel Moreno-Cuevas, the target of the search warrant. (TR1 32).[4] All suspects were separated from one another. (TR1 35). Also in the house was Defendant's two year old son. (TR1 8). At some point, agents had to find a guardian to care for the two juveniles. (TR1 11).

Defendant was also handcuffed but only after he was taken out of the house. (TR1 8, 34). Because of his size, agents had to use three sets of handcuffs in order to restrain his hands behind his back. (TR1 34). It was difficult for Defendant to walk. (TR1 37). He was first told to sit on a fountain-like structure in front of the home and later given a chair to sit in. (TR1 8, 38). He remained handcuffed for 40 to 45 minutes after which the handcuffs were removed and he remained outside for another 30 to 45 minutes. (TR1 8, 11, 12). In total, Defendant remained outside for an hour and a half to an hour and 40 minutes; from about 7;00 a.m. until almost 9:00 a.m. (TR1 12, 58). During that time, he alerted officers that he needed water and his medication. (TR1 39). After stating that he wanted to go inside his home, Agents took Defendant inside. (TR1 12, 41). According to Agent Ingegno, "[h]e chose to stay. I explained to him that it would be awhile because we had to make sure the house was safe and make sure every - -took pictures and everything like that." (TR1 12:20-22). At no time did Defendant express a desire to leave. (TR1 69).

---

[4]The transcript mistakenly refers to "Cuevas" as "Puevos."

1       Once inside, Defendant was escorted to the bathroom by an agent. (TR1 44).

2   Defendant told Agent Ignegno his medication was in his dresser in his bedroom. (TR1 43).

3   He was given water and his medication and then escorted to the room adjacent to the dining

4   room where he sat on a couch. (TR1 13, 45, Ex 4). Officers were not in the living room with

5   him at all times but he was always under police observation. (TR1 42). Defendant was not

6   made to sit like a statue but was allowed to move around a bit to help his sciatica. (*Id*.) The

7   time was almost 8:45 a.m. (Ex 5).

8       At 9:06 a.m., Agent Ingegno first approached Defendant and "advise[d] him of his

9   *Miranda* Rights even though he wasn't arrested, he was free to go." (TR1 45, 14:24-25).

10  Up until this point, Agent Ingegno admits that Defendant was not free to leave the residence.

11  (TR1 45). The agent then physically handed Defendant a Statement of Rights form with a

12  U.S. Immigration and Customs Enforcement seal on top. (TR1 46, 48). He never read it to

13  Defendant himself but instead told him to read it. (TR1 15 46-49). Defendant did as

14  instructed-he read it and initialed each right with the pen provided to him by Agent Ignegno.

15  (*Id*., Ex 9). Defendant clearly told the agent that he did not wish to speak to police. (TR1

16  15, 51). The agent understood that to be an indication of his right to remain silent. (TR1 51).

17  When this occurred, Agent Ignegno and Agent Yeater were seated in the two chairs directly

18  across from Defendant. (TR1 52). They each had a gun and their clothes identified them as

19  police officers. (TR1 52-53).

20      From 9:00 a.m. to 11:00 a.m., the house was full of police officers going through and

21  searching things. (TR1 53). During these two hours, Defendant's family arrived multiple

22  times. (TR1 16). His mother asked to see him so she was taken inside the house to make

23  sure he was in good health after which she left. (*Id*.) Later a family member provided one

24  of the agents with a number for an attorney. (*Id*.) At first Agent Morales had the card and

25  then gave it to Agent Cruz who gave it to Defendant. (TR1 16, 55).[5] According to Agent

26

27

---

28      [5]Neither Agent Cruz nor Agent Morales were called as witnesses by the government.

4

1  Ignegno, Agent Cruz told Defendant that he could call his lawyer but he declined.  (TR1 16,

2  66).

3       Agent Ingegno recalls that upon entry into the house, there was a dog inside, "a very

4  friendly dog."  (TR1 16:22-23).  Someone who had been in the house, presumably an agent,

5  put the dog in a car that was in the back yard.  (TR1 17).  Worried that it was too hot for the

6  dog, Agent Ingegno put it in the bathroom but she was going crazy and scratching, so agents

7  called animal control to take custody of the dog.  (Id.).  According to the Agent Ignegno,

8  when agents were done with the search, the dog's owner was free to pick it up at animal

9  control.  (TR1 17).  When asked why police didn't just put the dog in the large walled-in area

10 of the backyard, he said, "because we didn't know the dog - - dog might react to - - all the

11 agents later on."  (TR1 67:21-21).

12      After Defendant invoked his right to remain silent, Agents Ingegno and Yeater went

13 to the HSI headquarters where they remained for about an hour and a half.  (TR1 59-60).

14 Before leaving, Agent Ingegno told Defendant that they had found some guns in the house.

15 (TR171).  At the office, agents had a discussion about going back to the house and

16 reapproaching Defendant.  (TR1 59).  When asked exactly what he told Agent Yeater, Agent

17 Ingegno candidly stated, "[w]ell, I told her I said their standard practice is two hours.  We

18 can reapproach for interview."  (TR1 62:2-3).  The agent said that he learned in his law class

19 and training that two hours is the generally accepted number to reapproach.  (TR1 62).  When

20 asked to explain what had changed during the two hours from when Defendant invoked to

21 the time he and Agent Yeater reapproached Defendant, Agent Ingegno said, "[t]he cocaine

22 that was found, also the stolen gun that was found."  (TR1 62:24-25).

23      Approximately a little after 11:00 a.m., Agent Ingegno and Agent Yeater returned to

24 the house to requestion Defendant.  (TR1 18, 59).  The agent admitted that Defendant had

25 not said anything to reinitiate contact with the agent.  (TR1 59).  Nor had the agent heard

26 from any other agent that Defendant had changed his mind and now wanted to talk to police.

27 (TR1  65).  Agent Ignegno agreed that Defendant never rescinded his right to remain silent.

28

1   (TR1 64).  When asked, "[a]nd this is not Durazo coming to you and saying I want to talk

2   to you.  This is you approaching Durazo," Agent Ingegno said, "yes."  (TR1 53:22-24).

3        Agent Ingegno "explained to him that he was advised of his *Miranda* rights, that they

4   still apply, that he was free to go whenever he choose.  He chose to stay and that he's still is

5   free to go if he wishes.  I then went on to proceed to tell him that he told us there was no gun

6   in the house.  We found five, one of which was stolen.  I told him we found cocaine within

7   the house.  I also told him we found Jasial Moreno-Puevos [sic: Cuevas] who is here in the

8   country illegally."  (TR1 18: 1-8).  Defendant then admitted that he knew Mr. Cuevas was

9   in the country illegally.  (TR1 18).  The interview lasted 20 to 25 minutes.  (*Id.*)  After the

10  interview, agents walked Defendant around his house, showed him the condition of the house

11  and left him an inventory of what was taken.  (TR1 17, 18).  Agents left at approximately

12  11:45 to 11:55 a.m.  (TR1 71).  Defendant was not placed under arrest.  (TR1 19).

13       Agent Ingegno was recalled by the government to testify at the second hearing.  (Doc

14  25).  He restated that he never heard Defendant ask for a lawyer or a cell phone to call a

15  lawyer.  (TR2 45).  He admitted as before, that he had been gone from the scene for an hour

16  and a half and added that the HSI office in Douglas was a mile and a half away.  (TR2 46).

17  Agent Ingegno testified that when he reinitiated questioning, he only reminded Defendant

18  that his rights still applied.  (TR2 46, 48).  The questioning at 11:00 a.m. occurred in the

19  same room where Defendant was questioned before, only two hours later (TR2 46).

20       **B.    Special Agent Yeater**

21       Agent Yeater testified that she is an agent with the Internal Revenue Service, Criminal

22  Investigations.  (TR1 73).  Because she had been apprised of some potential money issues

23  going on in Douglas, she was invited to participate in the search of Defendant's home.  (TR1

24  77).  Of the 30 law enforcement officers that participated in the search, she was one of the

25  agents working on the outside perimeter.  (TR1 77).  After entry was made, the agent stayed

26  outside in the front of the home for some time, keeping an eye on the perimeter and also

27  making sure that the individuals that were removed from the home stayed seated. (TR1 77,

28

78).    According to Agent Yeater many times during her contact with Defendant, she asked him how he was and whether he needed anything. (TR1 74).  Many times she reminded him that he was free to leave.  (TR1 75).

Agent Yeater was present during Defendant's initial reading of *Miranda* at 9:06 a.m. (TR1 73, 83).  Without any equivocation, Defendant invoked his right to remain silent after which Agent Yeater asked him only questions relating to his well-being.  (TR1 89, 103). When asked about the two hour period from when Defendant invoked to when he was reapproached, Agent Yeater explained that she went back to headquarters with Agent Ingegno. (TR1 95, 102).  When asked when the decision was made to return to the residence and requestion Defendant, she explained that the decision was not made until after they went back to the house and saw that Defendant was still there.  (TR1 94).  It was only after being informed that Agent Ingegno had just testified that he and Agent Yeater talked about reappproaching Defendant while at headquarters, that Agent Yeater admitted that they had "discussed the possibility."  (TR1 95:5).

Agent Yeater was present during the second interview.  (TR1 73).  During the two hour period between the interviews, no one alerted her that Defendant had expressed a desire to waive his rights and speak to agents.  (TR1 96).  In her presence, Defendant did not ask for a cell phone or ask to speak to his lawyer.  (TR1 105).

The second interview was conducted in the same place as the first.  (TR1 96).  Agent Yeater assumed the same position, sitting in the same area, on one of the chairs depicted in Exhibit 8.  (TR1 76, 85, 96).  She heard Agent Ingegno tell Defendant that his *Miranda* rights still applied but *Miranda* was not read to him.  (TR1 97).  Defendant did not sign any additional documents nor was he given a waiver of rights in written form.  (TR1 98).  Before questioning Defendant, she heard Agent Ingegno tell him what agents had found in his home- a person living illegally in the United States, personal use cocaine, and several firearms, one of which was stolen.  (TR1 98, 99).  Incriminating statements followed.  (TR1 99, 100).

### C.    Defendant

Defendant testified that at the time of the search of his home, he weighted  575 pounds. (TR1 106-107). He was under the care of a doctor due to a herniated disc and was taking several muscle relaxers.  (TR1 107-108). Because of his spine and weight issues, Defendant had problems with mobility. (TR1 109).

On April 2, 2013 at approximately 7:00 a.m., as he was walking to open the door, Defendant heard a bang and the police ripped open the front door and came into his house. (TR1 110). Police told him to put his hands on his head and walk towards them. (TR1 111). Defendant told the police that he had a spine issue and was hurting. (TR1 111-112) Agents then took him through the front door and handcuffed him. (TR1 110). Defendant was taken outside and told to stand, but after telling the agents that he couldn't stand still, he was allowed to sit down on "a little tiny fountain" that was not wide enough to hold him safely. (TR1 113). Defendant stayed in that position for 20 to 30 minutes; there was an agent with him at all times. (TR1 115). Defendant was then told to go to the front of the garage door where agents brought him a chair and he sat for another hour, still handcuffed. (TR1 115-116). Later, the handcuffs were removed but two officers stayed with him the whole time he was outside. (TR1 117). When asked about the other people who were in the house, Defendant stated that they were no longer there; the agents had told them to leave. (TR1 118).

At some point, Defendant was asked if he would be more comfortable inside and when he replied that he would, was escorted inside and told to go the living room. (TR1 119). At all times there was an agent present with him there, too. (TR1 120). He was not allowed to go to his bedroom and at no time did he feel free to leave. (TR1 114, 116, 120). Defendant felt he was in trouble and under arrest. (TR1 117, 120). So he sat in the living room, occasionally kneeling as he couldn't sit for long periods of time. (TR1 121-122).

At various times when he was both inside and out, he was asked if he was okay and if he needed anything. (TR1 123). While outside, he had asked agents if he could have his

medication but was told that he needed to wait until a supervisor said it was okay.  (TR1 125). Agents did not provide Defendant with his medication for two hours and only after he was read his *Miranda* warnings. (TR1 123 -124).

It was at approximately 9:00 a.m. when Special Agent Ingegno approached him along with Agent Yeater in the living room.  (TR1 124).  Agents handed him the Statement of Rights (Ex. 9) and told him to read each one carefully and sign off on each one after he had read them.  (TR1 125).  Defendant did as he was told.  (TR1 126).  Agent Ingegno asked him whether he wanted to waive his rights and speak to him. (*Id*.).  Defendant told him that he "didn't want to answer no questions." (TR1 126:21).   Neither agent asked Defendant any questions and told him he was free to go.  (TR1 126 -127).  But Defendant had no where to go; he could not drive his car at the time and was taking medications.  (TR1 127).

At some point, Defendant's mother came to check on him.  (TR1 127). The police allowed her inside to the dining area but not into the front living room where he was sitting. (TR1 127-128).  Other than asking if he was okay, he was not allowed to have a conversation with her and she was not allowed to sit with him.  (TR1 128-129).  While there, Defendant's mother gave one of the agents her son's lawyer's business card and asked that it be given to Defendant. (TR1 129).  Someone did give Defendant the business card.  (*Id*.).  When asked if he ever asked for a lawyer, Defendant answered, "[w]ell, I had –I had the card.  They have given me the card in my hand–the officer.  And I believe I told him that I–I would speak to my lawyer and like later." (TR1 129:21-25).  Defendant could not remember the name of the agent he spoke to about a lawyer.  (TR1 130).  When asked if he ever asked for a phone to call his lawyer, Defendant said, "I–I did.  At that time, I didn't ask no more."   (TR1 131:1). When asked for clarification, Defendant testified, "[w]ell, I told him if I could....and he told me that–that he was going to ask somebody else, another supervisor, agent or–." (TR1 131:4-7).  He never heard back from that agent and he was never provided a cell phone to call his lawyer.  (TR1 130-131).  At some point while he was in the living room,

Defendant was escorted to the bathroom. (TR1 132). He had to use the restroom with the door open and an agent standing nearby. (TR1 132-133).

Agents reapproached Defendant at 11:04 a.m. and told him that *Miranda* were still in effect. (TR1 133). Since one of the rights he had chosen to invoke was his right to remain silent, it was his belief that he could still remain silent. (TR1 133). At no time did Defendant ever tell anyone that he wanted to speak to the police or that he had changed his mind. (TR1 133). According to Defendant when Agent Ignegno came back to the living room, "he seemed a little frustrated with-- the fact that –that I had lied to him" (TR1 134:14-15) about there being no guns in the house. (TR1 134). Defendant responded that he didn't lie, that he had no knowledge of the guns being there. (*Id.*) The agent then told Defendant that they had found some personal cocaine in one of the bedrooms and wouldn't he know about that. (TR1 134-135). He also told Defendant that one of the guns was guns was stolen. (TR1 135). The agent referred to Jasial's (illegal) situation, how much Defendant must really love the kid and how he and his sister were in a lot of trouble because of him. (TR1 135-136). When the agent suggested that Defendant's sister had been arrested, Defendant asked what was going on with his sister. (TR1 136). The agent responded, "you start answering my questions and I'll start answering yours." (TR1 136:16-18). A confession presumably followed.

On cross-examination, Defendant admitted that he freely and voluntarily answered the questions asked by the agents. (TR1 137). He also agreed with the government that he was not in handcuffs when questioned, had been told several times by Officer Yeater and others that he was free to leave and that he had not been placed under arrest. (TR1 137-138).

**D.    Defendant's Mother**

Angelina Durazo testified that Defendant is one of her three children.  (TR2 4).[6] Because of her son's medical issues, he was not working.  (TR2 5).  Ms. Durazo has three grandchildren, two are children of Defendant, a girl who is seven years old and a boy who is two.  (TR2 5).  Both children live with Defendant full time and he is with them at home every day, except when Ms. Durazo takes her granddaughter to school in the mornings. (TR2 6, 7).  On the morning of April 2, 2013, a little bit before 8:00 a.m., Ms. Durazo got a telephone call indicating that there was a problem with her son and she needed to pick up her two year old grandson.  (TR2 6, 7).  When she arrived at her son's home, she saw a lot of police and people outside who had been arrested.  (TR2 8).  Defendant was not outside, but the little boy was in a truck along with one of the young men that lives at the home.  (TR2 8).  Ms. Durazo asked the police if Defendant was okay and if she could see him.  (TR2 9). Police told her that he was okay but would not tell her what was going on.  (TR2 9).  Ms. Durazo was taken inside the house so she could see that Defendant was alright.  (TR2 9).  He was in the living room, a room which is directly right of the front door.  (*Id*.).  He was sitting in a chair surrounded by many policemen but was not handcuffed.  (TR2 10, 11, 13).  Ms. Durazo was not allowed to have any physical contact or communication with her son although he was able to tell her he was fine; agents took Ms. Durazo back outside.  (TR2 10, 11).  At no time was she told by anyone that she could take Defendant anywhere.  (TR2 12).

Once outside, Ms. Durazo gave one of the officers her son's lawyer's business card and asked that it be given to Defendant.  (TR2 11, 12).  Given the many police around, Ms. Durazo thought that something big might be happening with her son but no one would give her an explanation.  (TR2 13, 14).  Police told her that she would have to go to the office for an explanation.  (TR2 13).  She did but was not given any information.  (TR2 13).

### E.    Special Agent Wood

---

[6]TR2 refers to the transcript of the August 26, 2013 hearing.

HSI Agent Wood testified that he was also involved in executing the search warrant in Defendant's home.  (TR2 15).  He was the team leader and part of the breaching entry team, those that apply force to the front door to get into the home.  (TR2 16, 18).  He was the officer with the "battering ram."  (TR2 18).  Before making entry, another agent announced loudly both in English and in Spanish that police were coming in.  (TR2 19).   Search protocal was followed (*Id*.)  Two agents went room to room, collecting evidence and photographing what was found.  (TR2 20).  Agent Wood also explained that in addition to the entry team, there were agents on the perimeter of the home to make sure that no one ran away.  (TR2 20).  All police officers were wearing their firearms and had markings on their body to identify them as police.  (TR2 21).  Police told all individuals who were found within the home to put their hands up, and they were all handcuffed and escorted out of the house.  (TR2 21).

After the case agents went back to their office, Agent Wood was in charge of the search team.  (TR216).  He testified that at no time did any officer approach him and say that Defendant wanted a cell phone or a lawyer.  (TR2 16, 17).  While the search was going on Agent Wood only observed Defendant from time to time but for officer safety reasons, other officers were watching him at all times.  (TR2 17, 25, 26).  No one ever told Agent Wood that Agent Ingegno had *Mirandized* Defendant or that he had invoked his right to remain silent.  (TR2 24).  When asked about the lawyer's business card, Agent Wood said that it did get to Defendant but he was not the agent who provided it to him.  (TR2  17).  He "vaguely remember[s] that happening, that a business card was handed over to an- - to an agent."  (TR2 17:10-11).  Agent Wood said that according to the reports, it was Special Agent Morales that received the business card.  (TR2 24).

### F.   Special Agent Medina

HSI Agent Medina testified that she arrived at the search scene as several subjects were being escorted from the property.  (TR2 30).  Her duties were to record the evidence and log it in as it was brought to her by the agents.  (TR2 30, 31).  She did that at the dining

room table on her laptop where she sat in a chair under the clock.  (TR2 30, 38-39, Ex 8.)
Her main focus was to enter the data in reference to the evidence.  (TR2 42).

Agent Medina testified that she was fairly close to Defendant but never heard him say
that he wanted to use a cell phone or talk to a lawyer.  (TR2 34).   She also stated that
although she was at the home by 8:00 a.m., she could not remember exactly what time she
sat at the table (TR2 37, 38), but she knows she was not present for Agent Ingegno's first
attempt to interview Defendant at 9:00 a.m.  (TR2  37).   She was present for the second
interview but did not hear any of their conversation. (TR2 40).  With respect to the lawyer's
business card, she remembers her group supervisor, Carlos Cruz giving Defendant the card.
(TR2 42).    When asked if Defendant had access to his cell phone, she stated, "[n]ot that I
could see."  (TR2 42:25).

## II.   CONCLUSIONS OF LAW

Before a person is questioned by law enforcement officers after being "taken into
custody or otherwise deprived of his freedom of action in any significant way," he must first
be warned that he has the right to remain silent, that any statements he does make may be
used against him, and that he has a right to the presence of an attorney, either retained or
appointed. *Miranda v. Arizona*, 384 U.S. 436, 467-68 (1966).

### A.   Custody

Determining whether a suspect is "in custody" for purposes of *Miranda* requires
application of an objective test; it depends on the objective circumstances of the interrogation
and not on the subjective views of either interrogating officers or the person being
questioned.   *J.D.B. v. North Carolina*, ––– U.S. ––––, 131 S.Ct. 2394, 2402 (2011);
*Yarborough v. Alvarado*, 541 U.S. 652, 662–63 (2004).   Under this test, two inquiries are
made: (1) what were the overall circumstances surrounding the interrogation; and (2) given
those circumstances, would a reasonable person in the suspect's situation have felt free to
terminate the interrogation and leave. *Thompson v. Keohane,* 516 U.S. 99, 112 (1995*).*

1    While interrogation within a suspect's home is not per se custodial, *Beckwith v. U.S.*,

2   425 U.S. 341, 343-45 (1976), such questioning may be custodial under certain circumstances,

3   *Orozco v. Texas*, 394 U.S. 324, 326-27 (1969). "Applying *Miranda* to the task of sorting a

4   non-custodial in-home interrogation from a custodial one, our analysis considers the extent

5   to which the circumstances of the interrogation turned the otherwise comfortable and familiar

6   surroundings of the home into a "police-dominated atmosphere." *U.S. v. Craighead*, 539

7   F.3d 1073, 1083 (9th Cir. 2008). Several factors are relevant in this determination: (1) the

8   number of law enforcement personnel and whether they were armed; (2) whether the suspect

9   was at any point restrained, either by physical force or by threats; (3) whether the suspect

10   was isolated from others; and (4) whether the suspect was informed that he was free to leave

11   or terminate the interview, and the context in which any such statements were made. (*Id.*)

12

13    In the present case, the government argues that while agents' initial contact with

14   Defendant was custodial (from 7:00 to 9:00 a.m.), it became noncustodial after the house was

15   secured and Defendant was allowed to remain in his living room (from 9:00 a.m. to 12:00

16   p.m.). The Court disagrees. A total of 30 agents from five different agencies participated

17   in the search of Defendant's home; after entry, 20 agents remained. A total of eight to nine

18   police cars surrounded the house; some of the units were marked; some had their emergency

19   lights on. Agents broke down the front door, yelled "police" and 13 officers entered with

20   guns drawn. All adults at the home including Defendant were told to put their hands up and

21   were handcuffed. Defendant remained handcuffed for 40 to 45 minutes while outside, at

22   times sitting on a tiny fountain that was too small and uncomfortable given his large frame.

23   He asked to be taken inside where he remained for more that three hours, all the while being

24   watched and watching a slew of agents search his home, even after being told agents were

25   looking for Mr. Cuevas who had already been arrested and removed. Defendant was only

26   allowed to use the restroom while accompanied by an officer and only then, with the door

27   open. He was not allowed to enter his bedroom and after two hours of asking, was finally

28

given his medication. He was not allowed any contact or conversation with his mother when she arrived to check on him.  His young child was removed from the house, albeit in the care of his grandmother, and the family pet was hauled off by animal control.  The implication of his detention was certain-he would remain in the custody of police indefinitely and he would not be  free to care for his young son or the family pet. Just because agents repeatedly used the magic words "you are not under arrest" and "you are free to leave" did not make this gathering non-custodial.

The government argues that keeping a close an eye on Defendant and taking physical control of him was justified to protect the safety of the officers.  While likely true and understandable from the officer's point of view, that justification is not relevant to whether or not Defendant was in custody for purposes of *Miranda*.  *U.S. v. Mittel–Carey*, 493 F.3d 36, 40 (1st Cir. 2007).  In finding that a custodial situation required *Miranda* warnings, the court in *Mittel-Carey* found that the following facts were dispositive:  (1) the early hour of the search and interrogation (6:25 a.m.); (2) the presence of eight officers in the home; (3) that the defendant was confronted with an unholstered gun in his darkened bedroom; (4) the physical control the agents maintained over the defendant at all times; (5) the length of the interrogation (ninety minutes to two hours); and (6) the coercive statements made by the interrogating agent, which seemed designed to elicit cooperation while carefully avoiding giving the defendant *Miranda* warnings. *Id*.  Of most weight to the court was the level of physical control that the agents exercised over the defendant during the search and interrogation.  *Id*.

The government also argues that the fact that Defendant was not formally arrested and taken into custody on April 2, 2013, after the search of his home is supportive of its argument that Defendant was not "in custody" for purposes of *Miranda*. The Court disagrees. After finding that an illegal alien was living in Defendant's home and obtaining an incriminating statement about his knowledge and intent, agents had probable cause to arrest him.  But rather than deal with the transportation and care involved with arresting, moving and housing

a large man with severe medical problems, the government chose not to arrest him but instead to summons him in on another date.  He was indicted and served with a summons on May 2, 2013 (Doc. 5).  Defendant appeared at his arraignment on May 10, 2013 and without objection from the government, was ordered formally released in part on the condition that he notify Pretrial Services when he fulfilled his physical therapy and medical treatment requirements, at which time his conditions of release could be reassessed.  (Docs. 6, 7). Obviously, all parties acted the way they did, some out of concern for Defendant and some because they did not want to be inconvenienced.  That behavior has nothing to do with the issue of whether or not Defendant's questioning was custodial.

Given the overall circumstances of Defendant's detention in his home, the Court finds it objectively reasonable for him to have felt he was under guard and *not* free to terminate the interrogation and leave his home. Defendant's confinement and restraint in his home was the equivalent of an arrest.  The Court finds that Defendant was in custody during his entire encounter with police, from 7:00 a.m. when agents busted into his home until 12 noon when they departed the scene. *Compare Beckwith v. U.S.*, 425 U.S. 341, 343-45 (1976) (defendant not in custody when IRS agents go to home where he occasionally stays, are invited in and have a "friendly" and "relaxed" conversation); *U.S. v. Coleman*, 208 F.3d 786, 788-90 (9th Cir. 2000) (defendant not in continuous custody where he had been released from custody for significant period (3 days) and questioning occurred in different setting (first at the police station and second, at his apartment)); and *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989) (no custody where suspect permitted to move about his home unaccompanied) with *Orozco v. Texas,* 394 U.S. 324, 326-27 (1969) (defendant, not handcuffed or physically subdued but still in custody when four officers entered his bedroom and acted as though he is "not free to leave"); *United States. v. Revels,* 510 F.3d 1269, 1275–77 (10th Cir. 2007) (handcuffing suspect upon entry of home contributed to custodial environment); *Sprosty v. Buchler*, 79 F.3d 635, 641–43 (7th Cir. 1966) (use of police cars to block  suspect's driveway to prevent his departure, and their standing so as to block his exit path from his home,

16

contributed to a custodial environment); and *U.S. v. Griffin*, 922 F.2d 1343, 1350 (8th Cir. 1990) (police officers permitting suspect to move around house for brief periods but insisting on escorting and monitoring him at all times found to be custodial).

### B.    Invocation of Rights

An accused who wishes to invoke his *Miranda* rights must do so unambiguously. *Davis v. United States*, 512 U.S. 452, 461-62 (1994). Ambiguity means having more than one interpretation or reference or having a double meaning. *Anderson v. Terhune*, 516 F.3d 781, 787 (9th Cir. 2008).   Remaining silent is insufficient to invoke a  right. *Berghuis v. Thompkins*, 130 S.Ct. 2250, 2259 (2010).  However, invocation must be construed liberally. *Hoffman v. United States*, 341 U.S. 479, 486 (1951). While a person need not rely on any special combination of words to invoke his rights, *Quinn v. United States*, 349 U.S. 155, 162 (1955), he must articulate his desire sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be an invocation of his constitutional rights. *Davis,* 512 U.S. at 459. In determining whether a suspect invoked this right, "a court should examine the entire context in which the claimant spoke." *Bradley v. Meachum*, 918 F.2d 338, 342 (2nd Cir.1990).

### 1.    Right to Remain Silent

Defendant clearly and unambiguously invoked his right to remain silent.  During the first attempted interrogation, Defendant was given a *Miranda* form to read. (Ex. 9). The first half of the form is entitled, "Statement of Rights."  It sets out the *Miranda* warnings as seven distinct rights, each separated by a space.  On the left side of each right, as instructed by Agent Ignegno, Defendant placed his initials, "JD" indicating that he understood each right.  The second half of the form  entitled "Waiver" reads:

> I have had the above statement of my rights read and explained to me and I fully understand these rights. I waive them freely and voluntarily, and without threat or intimidation and without and promise of reward or immunity.  I was taken into custody at_____(time), on_____ (date), and have signed this document at_____(time), on_____(date).

(Ex.9).

17

Four signature lines are provided after the paragraph:  one for a defendant's printed name, one for his signature and two for the signatures of two witnesses.  Defendant refused to sign the waiver.  His refusal to do so however is but one factor for consideration and does not inevitably preclude a finding of waiver.  *North Carolina v. Butler*, 441 U.S. 369, 373-76 (1979).  In this case not only did Defendant refuse to sign the waiver, he also stated outright to Agent Ignegno that he did not wish to speak to police.  Agents honored Defendant's invocation of his right to remain silent and all questioning ceased, but only for two hours at which time agents decided to give it another go.

### 2.    Right to Counsel

Defendant's mother testified that she brought her son's lawyer's business card and asked that it be given to him. Agent Ignegno said the card was handled by both Agent Morales and Agent Cruz and ultimately given to Defendant who claims to have invoked his right to counsel.  Both Agents Ingegno and Yeater left the home for almost two hours.  If Defendant asked for an attorney as he said he did, he may have done so outside of the presence of these two officers.  Agent Wood who was in charge of the search team after Agents Ingegno and Yeater went to headquarters admitted that he vaguely remembers the business card incident and only watched Defendant from time to time.  He was also never told that Defendant had been *Mirandized* or that he had invoked his rights.

There being no evidence to the contrary, the Court finds that Defendant clearly and unequivocally invoked his right to counsel and that agents obtained Defendant's statement in violation of his right to counsel.

### 3.    Continued Questioning

When a  suspect makes an unambiguous statement invoking his constitutional rights after being advised of *Miranda*, the law is clear-"all questioning must cease."  *Smith v. Illinois*, 469 U.S. 91, 98 (1984), *quoting Miranda*, 384 U.S. at 473–74; *Michigan v. Mosley*, 423 U.S. 96, 100 (1975).  Any subsequent statements are relevant only to the question whether the accused waived the right he invoked.  *Smith,* 469 U.S. at 98.

18

Whether interrogation may be reinitiated after a successful invocation at a later time is a question that the *Mosley* Court stated "turns almost entirely on the interpretation of a single passage in the *Miranda* decision." *Mosely*, 423 U.S. at 100. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id. quoting Miranda*, 384 U.S. at 473. This passage could mean that once a person has invoked his right to remain silent, he can never again be subjected to interrogation; or the passage could mean that only the immediate cessation of questioning must occur, thereby permitting resumption after a momentary respite. *Mosely*, 423 U.S. at 102. According to the *Mosely* Court, both interpretations are absurd. *Id*. Rather, under *Miranda*, the admissibility of statements obtained after the person in custody has decided to remain silent depends on whether his "right to cut off questioning" was "scrupulously honored." *Id*. "*Mosley* envisioned an inquiry into all of the relevant facts to determine whether the suspect's rights have been respected. Among the factors to which the Court looked in that case were the amount of time that elapsed between interrogations, the provision of fresh warnings, the scope of the second interrogation, and the zealousness of officers in pursuing questioning after the suspect has asserted the right to silence." *U.S. v. Hsu*, 852 F2d 407, 410 (9th Cir. 1988). The most important and crucial factor is the provision of a fresh set of *Miranda* rights. *Id. citing United States v. Heldt*, 745 F.2d 1275, 1278 n. 5 (9th Cir. 1984).

Here, Agents Ingegno and Yeater did not reapproach Defendant at 11:00 a.m. to determine if he in fact waived his right to remain silent at 9:00 a.m. The invocation did not need clarifying. Defendant said he did not want to talk with police and he refused to sign the waiver. By his own admission, Agent Ingegno reapproached Defendant to see if he had changed his mind. He even admitted (as did Agent Yeater after learning what Agent Ingegno had testified too) that it is standard police procedure within his agency to reapproach after the lapse of two hours.

1    Defendant described the agents as "frustrated." That stands to reason. They had been
2    searching Defendant's home for five hours. While police had found the subject of the search
3    warrant-Jasiel Moreno Cuevas-they did not find much else, at least nothing that would serve
4    as an additional basis for a federal indictment. So after Defendant invoked his right to
5    remain silent, they  went back to their office to regroup, waited the alloted two hours and
6    then returned to the home to see if they could elicit a confession. Agents confronted
7    Defendant with what was found in his house-a personal use quantity of cocaine and a stolen
8    gun. According to Defendant, when he inquired about his sister, he was told "you start
9    answering my questions and I'll start answering yours."

10    Under the facts presented by the witnesses, agents in this case did not by any stretch
11    of the imagination "scrupulously honor" Defendant's right to cut off questioning. The Court
12    finds that agents obtained the confession from the Defendant in violation of both his right to
13    counsel and his right to remain silent.

14    **C.    Voluntariness**

15    Statements taken in violation of *Miranda*, while inadmissible as part of the
16    prosecution's case-in-chief, are nonetheless admissible for impeachment purposes in the
17    event a defendant testifies at trial so long as they are  voluntary and uncoerced. *Oregon v.*
18    *Hass*, 420 U.S. 714, 722-24 (1975); *Harris v. New York*, 401 U.S. 222, 224–26 (1971). In
19    making this determination, a court's analysis must go beyond the mere fact that the statement
20    violates *Miranda*. *Parsad v. Greiner*, 337 F.3rd 175, 184-85 (2nd Cir. 2004). That is not to
21    say, however, that a police officer may freely disregard a suspect's invocation of his right to
22    remain silence. *Id*. It just means that the fact that a police officer takes a statement after a
23    suspect invokes his right to remain silent does not, standing alone, render the statement
24    involuntary. *Id*.

25    The inquiry into the voluntariness of a confession is the same as the inquiry into the
26    voluntariness of a waiver of *Miranda* rights. *See Derrick v. Peterson,* 924 F.2d 813, 820 (9th
27    Cir.1990). Only voluntary confessions are admissible. *Malloy v. Hogan*, 378 U.S. 1, 7

28

20

(1964). The government must prove voluntariness of a confession by a preponderance of the evidence. *United States v. Benitez,* 34 F.3d 1489, 1495 (9th Cir. 1994).[7] The voluntariness of a post-*Miranda* statement is analyzed in light of its independent surrounding circumstances. *Oregon v. Elstad,* 470 U.S. 298, 318 (1985). "In evaluating voluntariness, the test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Male Juvenile,* 280 F.3d 1008, 1022 (9th Cir.2002) (citation and internal quotation marks omitted); *see also Clark v. Murphy,* 331 F.3d 1062, 1072 (9th Cir.2003). The totality of the circumstances include: the crucial element of police coercion; the length of the interrogation; its location; its continuity; the defendant's maturity; education; physical condition; and mental health. *Taylor v. Maddox*, 366 F.3d 992, 1016 (9th Cir. 2004). Psychological coercion is equally likely to result in involuntary statements and is just as forbidden as violent or physical interrogation tactics. *Collazo v. Estelle*, 940 F.2d 411, 416 (9th Cir. 1991).

According to the record, entry into Defendant's home was made at 7:00 a.m., Defendant was read his *Miranda* rights at 9:00 a.m., he was reapproached at 11:00 a.m. and agents left the home at 12:00 p.m. The Court finds that five hours of detention with periodic questioning is not excessively long. *Compare Doody v. Schriro*, 548 F.2d 847, 867 (9th Cir. 2008) (confession not voluntary where 17-year old was interrogated for more than 12 unbroken hours embracing an entire night).

The defense argues that given Defendant's weight, sciatica, and the pain pills that he was taking, not allowing him to lay down in his bedroom somehow exploited his psychological vulnerabilities and compelled him to confess. The record does not support this. Although Defendant was not allowed to be in the comfort of his bedroom and the

---

[7]Contrary to the government's assertion at the motion hearing (TR2 49), the government alone carries the burden of proving by a preponderance of the evidence that a confession is voluntary. *United States v. Jenkins*, 938 F.2d 934, 937 (9th Cir.1991).

occupants of the home had been removed, he was not entirely isolated; he could see agents working at the dining room table.  And while confined to living room, he was allowed to move around and sit in positions that relieved his back pain.  He was allowed to use the bathroom, albeit with the door open and an agent hovering nearby.  He was provided with abundant water and his medications were eventually retrieved from his bedroom by agents so he could relieve his pain. Even though his mother was not allowed much contact with her son, she was allowed to see him and determine that he was okay. *See United States v. Walker*, 272 F.3d 407,413-414 (7th Cir. 2001) (confession voluntary where although the defendant was suffering some physical discomfort, he was alert and oriented when discharged from the hospital).

Under the totality of circumstances presented by this case, the Government has fulfilled its burden to prove Defendant's statement was voluntary by a preponderance of the evidence.  Should Defendant testify at trial, his confession is admissible for impeachment purposes.

## III.    RECOMMENDATION FOR DISPOSITION BY THE DISTRICT JUDGE

Based on the foregoing, the Magistrate Judge recommends that the District Court, after an independent review of the record, **GRANT IN PART** and **DENY IN PART** Defendant's Motion to Suppress Statements (Doc. 12) to the extent described above.

This Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment.  However, the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the District Court. *See* 28 U.S.C. § 636(b)(1) and Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure.  Thereafter, the parties have ten (10) days within which to file a response to the objections.  No replies are permitted without leave of court.  If any objections are filed, this action should be designated case number: **CR 13-714-TUC-RCC**.  Failure to timely file objections to any

factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to de novo consideration of the issues. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

DATED this 3rd day of September, 2013.


Jacqueline M. Rateau
United States Magistrate Judge